**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

SEVILLE LLC,

Plaintiff,

v.

COMMSCOPE, LLC and VISTANCE NETWORKS, INC.,

Defendants.

Case No. 1:26-cv-4978-VSB

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ....................1

BACKGROUND ....................3

A. The 2027 Notes Indenture and Parties Thereto....................3

B. The Term Loan Credit Agreement and Parties Thereto ....................4

C. Valid Amendment to the 2027 Notes Indenture....................6

D. Holdings Sells CST, Borrower Repays the Term Loan, the Loan Documents Terminate, and Defendants Are Released ....................7

E. A Single Term Loan Lender Claims Entitlement to More Money and Sues ....................9

LEGAL STANDARD....................10

ARGUMENT....................12

I. PLAINTIFF DOES NOT HAVE STANDING TO SUE DEFENDANTS ....................12

II. PLAINTIFF’S BREACH OF CONTRACT CLAIM IS INACTIONABLE....................18

III. PLAINTIFF’S BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM IS INACTIONABLE ....................21

CONCLUSION....................26

# TABLE OF AUTHORITIES

## CASES

*2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*,
96 F. Supp. 3d 182 (S.D.N.Y. 2015)........................................................................ 22

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
98 N.Y.2d 144 (N.Y. 2002) ...................................................................................... 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................. 10

*AT&T Corp. v. Atos IT Sols. & Servs., Inc.*,
708 F. Supp. 3d 385 (S.D.N.Y. 2023)...................................................................... 12

*Barshay v. Naithani*,
2023 WL 8708424 (2d Cir. Dec. 18, 2023) ............................................................. 16

*Beal Sav. Bank v. Sommer*,
8 N.Y.3d 318 (N.Y. 2007) ........................................................................................ 23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................. 10

*Cambridge Cap. LLC v. Ruby Has LLC*,
565 F. Supp. 3d 420 (S.D.N.Y. 2021)...................................................................... 25

*Campbell v. Whole Foods Mkt. Grp., Inc.*,
516 F. Supp. 3d 370 (S.D.N.Y. 2021)...................................................................... 10

*Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*,
17 N.Y.3d 269 (2011) ............................................................................................... 16

*Cordero v. Transamerica Annuity Serv. Corp.*,
39 N.Y.3d 399 (N.Y. 2023) ...................................................................................... 19

*Credit Francais Int'l S.A. v. Sociedad Financiera de Comercio, C.A.*,
490 N.Y.S.2d 670 (N.Y. Sup. Ct. 1985) ................................................................... 13

*Edwards v. Sequoia Fund, Inc.*,
938 F.3d 8 (2d Cir. 2019).......................................................................................... 19

*Fernandez v. UBS AG*,
222 F. Supp. 3d 358 (S.D.N.Y. 2016)...................................................................... 10

*Frascatore v. Blake*,
344 F. Supp. 3d 481 (S.D.N.Y. 2018)...................................................................... 11

*Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding LLC*,
20 N.Y.3d 438 (N.Y. 2013) .......... 22

*Greenfield v. Philles Recs., Inc.*,
780 N.E.2d 166 (N.Y. 2002) .......... 18, 19

*Gulley v. United States*,
150 Fed. Cl. 405 (2020) .......... 17

*In re Application of Union Ferry Co., of Brooklyn*,
98 N.Y. 139 (N.Y. 1885) .......... 13

*In re Enron Corp.*,
302 B.R. 463 (Bankr. S.D.N.Y. 2003) .......... 12, 13, 14

*In re Lehman Bros. Holdings, Inc.*,
541 B.R. 551 (Bankr. S.D.N.Y. 2015) .......... 21

*In re Young Broad., Inc.*,
No. 09-10645, 2009 WL 8189478 (Bankr. S.D.N.Y. 2009) .......... 16

*In Touch Concepts, Inc. v. Cello P'Ship*,
949 F. Supp. 2d 447 (S.D.N.Y. 2013) .......... 24, 25

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
62 F.3d 69 (2d Cir. 1995) .......... 11

*M/A-COM Sec. Corp. v. Galesi*,
904 F.2d 134 (2d Cir. 1990) .......... 25

*Moran v. Erk*,
11 N.Y.3d 452 (N.Y. 2008) .......... 23

*Murphy v. Am. Home Prods. Corp.*,
58 N.Y.2d 293 (N.Y. 1983) .......... 22

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016) .......... 12

*Quinn v. Walgreen Co.*,
958 F. Supp. 2d 533 (S.D.N.Y. 2013) .......... 12

*S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*,
520 F. Supp. 3d 497 (S.D.N.Y. 2021) .......... 21, 25

*Sackin v. TransPerfect Glob., Inc.*,
278 F. Supp. 3d 739 (S.D.N.Y. 2017) .......... 18

*Schron v. Troutman Sanders LLP*,
986 N.E.2d 430 (N.Y. 2013)........................................................................................ 22

*Sec. Alarm Fin. Enters., L.P. v. Citizens Bank, N.A.*,
2020 WL 408351 (S.D.N.Y. Jan. 24, 2020) ............................................................... 15

*Silver v. Nissan-Infiniti LT, LLC*,
724 F. Supp. 3d 217 (S.D.N.Y. 2024)......................................................................... 19

*Suthers v. Amgen, Inc.*,
441 F. Supp. 2d 478 (S.D.N.Y. 2006)......................................................................... 22

*Tellabs, Inc. v. Makor Issues & Rts. Ltd.*,
551 U.S. 308 (2007)..................................................................................................... 11

*Thayer v. Dial Indus. Sales, Inc.*,
85 F. Supp. 2d 263 (S.D.N.Y. 2000)........................................................................... 11

*Thyroff v. Nationwide Mut. Ins. Co.*,
460 F.3d 400 (2d Cir. 2006)......................................................................................... 22

*Wade Park Land Holdings, LLC v. Kalikow*,
589 F. Supp. 3d 335 (S.D.N.Y. 2022)......................................................................... 16

**RULES & OTHER AUTHORITY**

Fed. R. Civ. P. 12(b)(1)........................................................................................................ 10

Fed. R. Civ. P. 12(b)(6)........................................................................................................10, 11

*Exclusive,* Black's Law Dictionary 459 (2d ed. 1910) ..................................................13

## PRELIMINARY STATEMENT

This case is frivolous. Plaintiff is one of hundreds of lenders to a term loan to Defendants totaling over $3 billion. As is customary in institutional lending arrangements, the lenders appointed one contractual party as their "Agent" and gave it the irrevocable and exclusive authority to act on their collective behalf. When Defendants later sought to sell their largest business segment and use the proceeds to repay the term loan, the Agent issued a "Payoff Letter" specifying the amount owed ($3,156,765,657.16) if Defendants chose to repay the loan in full on that same date. Defendants paid that precise amount, the loan agreement ended, and Defendants received from the Agent a written release from liability on behalf of the lenders.

Despite all of that—months after the loan was repaid in full and terminated—one former term loan lender (Plaintiff), at the purported direction of other unnamed former lenders, filed this lawsuit claiming Defendants owe a "prepayment premium" totaling an additional $150 million. There are several facial deficiencies with Plaintiff's claims.

First, Plaintiff lacks standing to sue. The (now-terminated) loan documents only gave standing to the Agent, not individual lenders like Plaintiff. Here, the party with the authority to sue—the Agent—already considered the sale's transaction structure, concluded it did ***not*** trigger a prepayment premium, set and collected from Defendants the loan's payoff amount, found the loan was satisfied in full and ended by its own terms, and therefore released all claims against Defendants. Having delegated the right to enforce the credit agreement to their Agent, Plaintiff and the other lenders are bound by their Agent's decisions. The term loan that Plaintiff purports to sue under no longer exists, and even if it did, Plaintiff lacks the authority to bring these claims.

Second, there's a good reason why the Agent elected not to demand a prepayment premium or to sue Defendants for such amount: it was not due under the plain language of the contract. The credit agreement provides that Defendants do not owe a premium if they prepay the loan in

connection with a "Change of Control," as defined thereunder. The credit agreement expressly incorporates the definition of "Change of Control" from a separate lending document (an indenture for notes issued to an entity affiliated with Defendants). Under the operative definition contained in that indenture, it is indisputable that Defendants' sale qualifies as a "Change of Control" and thus does not trigger a prepayment premium. But Plaintiff misleadingly cites an outdated definition of "Change of Control," which was validly amended during the contract term. Plaintiff cannot use sleight of hand to concoct a breach of contract claim with inoperative language.

Finally, because Plaintiff does not like the result under the amended definition, Plaintiff is left to allege that the amendment itself was somehow a "breach of the covenant of good faith and fair dealing" implicit in all contracts. That argument flies in the face of New York law, which makes clear that a party never breaches the implied covenant by enforcing its own contractual rights to its advantage. Sophisticated parties advised by counsel (much less lenders in multi-billion-dollar loans) are bound by the words in their negotiated contracts. Here, the term loan lenders chose to incorporate a definition from a separate notes indenture into their lending document. Thus, when the definition in the notes indenture was validly amended, it carried through to the term loan. There is no basis for this Court to refuse to enforce that unambiguous amended contractual term (as required by the credit agreement), and its enforcement does not somehow create a claim for breach of the implied covenant of good faith and fair dealing.

Plaintiff's claims for a prepayment premium fail as a matter of law, and the text of the loan documents clearly demonstrates why. The Court should dismiss the Complaint with prejudice.

## BACKGROUND

### A. The 2027 Notes Indenture and Parties Thereto

"CommScope" is a U.S.-based telecommunications and network infrastructure business that operates through several affiliated entities. *See* Ex. 1, Compl. ¶ 17.[1] In the past, it owned several business segments, the largest of which was the Connectivity and Cable Solutions ("CCS") segment run by non-defendant CommScope Technologies LLC ("CST"), which, among other things, provided wired infrastructure for customers on a global scale. *See id.* ¶ 23.

Several entities in the corporate family are relevant here due to their involvement in various different loan agreements and indentures. Initially, non-defendant CST was a wholly owned subsidiary of CommScope, LLC[2] ("Borrower"), which was, in turn, a wholly owned subsidiary of CommScope Holding Company, Inc.[3] ("Holdings"). *See id.* ¶¶ 8, 24. In March 2017, CST executed an Indenture pursuant to which it issued to holders $750 million aggregate principal amount of 5.000% senior notes due 2027 (the "2027 Notes Indenture"), which were scheduled for final maturity on March 13, 2027 (the "2027 Notes").[4] *See* Ex. 2, 2027 Notes Indenture § 1.01

---

[1] Unless otherwise indicated herein, all internal citations and quotation marks are omitted, emphasis is added, and citations to "Ex _" refer to exhibits attached to the Declaration of Blake T. Denton, submitted herewith.

[2] CommScope, LLC was later renamed Vistance Networks Holdings, LLC. *See* ECF No. 1-2 ¶ 3.

[3] CommScope Holding Company, Inc. was later renamed Vistance Networks, Inc. Ex. 1, Compl. ¶ 8; *see* ECF No. 1-2 ¶¶ 4–5.

[4] The Complaint incorporates by reference and discusses two sets of contracts: the Term Loan Credit Agreement (described and further discussed below) and Senior Notes Indentures (defined to include the 2027 Notes Indenture). *See, e.g.,* Ex. 1, Compl. ¶¶ 1–5 (TLCA), 33–35 (Senior Notes Indentures); Ex. 3, TLCA § 1.01 (defining "Senior Notes Indenture" and "Senior Unsecured Notes"). Capitalized terms not defined herein have the meanings ascribed to them in the Term Loan Credit Agreement, 2027 Notes Indenture, and their related contracts.

(defining "Initial Notes"). CST is not a party to this case, and Plaintiff Seville, LLC does not purport to sue under the 2027 Notes Indenture.

**B. The Term Loan Credit Agreement and Parties Thereto**

In 2024, Borrower, along with a group of lenders (collectively, the "Term Loan Lenders")—with both sides represented by sophisticated counsel—negotiated for a loan to Borrower so it could refinance existing debt. Those negotiations culminated, on December 17, 2024, in the 185-page Term Loan Credit Agreement (the "Credit Agreement" or "TLCA"), entered into among Borrower, Holdings, Apollo Administrative Agency LLC as administrative and collateral agent ("Apollo" or the "Agent"), and the various lender parties thereto. *See generally* Ex. 3, TLCA. The Credit Agreement provided that Borrower would receive initial term loans in the principal amount of $3,150,000,000 (collectively, the "Term Loan"), repayment of which was to be made by Borrower over five years and was guaranteed by Holdings. *Id.* § 1.01 (defining "Closing Date," "Guarantors," "Holdings Guaranty," "Initial Term Commitment," and "Maturity Date") & Exhibit D-1 (Form of Holdings Guaranty). The loan would accrue interest at rates that varied based on Borrower's leverage ratios. *See id.* (defining "Applicable Rate").

The Credit Agreement, which is governed by New York law, *id.* § 10.16(a), provided that, by the end of the loan, Borrower would repay the Term Loan Lenders their full loan principal, fees, and all accrued interest. *Id.* §§ 1.01, 2.05(a), 2.09. The Credit Agreement also allowed for prepayment of the Term Loan by Borrower prior to the scheduled maturity date. *Id.* § 2.05(a). In certain prepayment scenarios, the Credit Agreement awarded the Term Loan Lenders ***an additional*** prepayment premium (on top of the principal, fees, and accrued interest) if Borrower repaid the Term Loan within 18 months of the Closing Date on specified terms. *Id.*

Relevant here, even if Borrower repaid the Term Loan within that time period, Borrower was not obligated to pay a prepayment premium if it did so "in connection with a Change of

Control . . . ." *Id.* § 2.05(a)(iv). "Change of Control" is a specifically defined term in the Credit Agreement, which incorporates by cross-reference definitions from other lending documents. *Id.* § 1.01 (defining "Change of Control"). It is defined in part as "any change in control (or similar event, however denominated) with respect to Holdings or the Borrower shall occur under and as defined in any Senior Notes Indenture." *Id.* A "Senior Notes Indenture" includes the 2027 Notes Indenture "as thereafter amended, restated, amended and restated, modified, replaced, waived, supplemented or restated from time to time." *Id.* (defining "Senior Notes Indenture," "Senior Notes," and "Senior Unsecured Notes").

In the Credit Agreement, the Term Loan Lenders appointed Apollo as Agent to act on their behalf. Ex. 3, TLCA § 9.01 ("Each Lender hereby irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document . . . ."). That delegation provided that "the ***authority to enforce rights and remedies*** hereunder and ***under the other Loan Documents*** against the Loan Parties or any of them shall be vested ***exclusively in***, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained ***exclusively by, the Administrative Agent*** . . . ***for the benefit of all the Lenders***." *Id.* § 10.03.

In the case that "any Event of Default occurs and is continuing, the Administrative Agent," *i.e.*, Apollo, was the party vested under the Credit Agreement with the power to declare, on behalf of the Lenders, all amounts "immediately due and payable" and "exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents." *Id.* § 8.02(b), (d).

The Credit Agreement also includes a concept of "Required Lenders" (*i.e.*, lenders holding a majority of the outstanding loans) and provides scenarios in which they can direct the actions of the Agent, such as in connection with declaring or enforcing an "Event of Default." *See id.* §§ 1.01 (defining "Required Lenders," "Total Outstandings," and "Outstanding Amount"), 9.05 ("The Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders…"). It is only in the limited circumstance where "there is no Person acting as Administrative Agent hereunder" that the ability to enforce rights and remedies may extend directly to the "Required Lenders." *See id.* § 10.03.

**C. Valid Amendment to the 2027 Notes Indenture**

CST and the trustee under the 2027 Notes (Wilmington Trust, National Association) (the "Trustee") executed a series of amendments and modifications to the 2027 Notes Indenture over the eight years that it was in effect.[5] On August 7, 2025, the parties executed the Seventh Supplemental Indenture, which "delete[d] the definition of 'Change of Control' in its entirety" from the 2027 Notes Indenture and inserted a new definition. Ex. 4, Seventh Supp. Indenture § 2; *see* Ex. 1, Compl. ¶¶ 33–35. The new definition provided that there was a "Change of Control" upon the "occurrence of any of the following events":

> (i) any person or 'group' . . . acquires beneficial ownership of more than 50.0% of the Voting Stock . . . of CommScope;[6] (ii) the sale, lease or transfer, in one or a series of related

---

[5] The 2027 Notes Indenture provided that it could be "amended or supplemented by CommScope . . . and the Trustee without notice or consent of any Holder" of the 2027 Notes in two relevant circumstances: (1) "to add to the covenants of CommScope or the Issuer for the benefit of the Holders [of the 2027 Notes] or to surrender any right or power [t]herein conferred upon CommScope, the Issuer or any other Guarantor"; and (2) "to make any change that does not adversely affect the rights of any Holder [of the 2027 Notes] in any material respect." Ex. 2, 2027 Notes Indenture § 9.1(viii)–(ix).

[6] "CommScope" is defined in the 2027 Notes Indenture as "CommScope, Inc., a Delaware corporation and not any of its subsidiaries." Ex. 2, 2027 Notes Indenture § 1.01. CommScope, Inc. was later renamed CommScope LLC, and then Vistance Networks Holdings, LLC. *See supra* note 2.

> transactions, of all or substantially all of the assets of CommScope and its Subsidiaries, taken as a whole, to any Person; or (iii) CommScope ceases to own, directly or indirectly, 100.0% of the outstanding Capital Stock of the Issuer [CommScope Technologies LLC].

Ex. 4, Seventh Supp. Indenture § 2; *see* Ex. 1, Compl. ¶ 35.

### D. Holdings Sells CST, Borrower Repays the Term Loan, the Loan Documents Terminate, and Defendants Are Released

On August 3, 2025, Holdings reached an agreement to sell its CCS segment, which included CST, to Amphenol Corporation for $10.5 billion in cash (the "Sale"). Ex. 1, Compl. ¶¶ 23–24. The Sale, if it closed, would result in a Change of Control under the 2027 Notes Indenture because it satisfies prongs (ii) and (iii) of the operative definition: it was a sale of all or substantially all of the assets of CommScope and its subsidiaries (prong ii); and CommScope would cease to own 100% of the outstanding Capital Stock of CST (prong iii). *See* Ex. 4, Seventh Supp. Indenture § 2. Because the Sale would result in a Change of Control under a Senior Notes Indenture, it therefore would result in a Change of Control under the Credit Agreement, which expressly incorporates by reference such amended definition. Ex. 3, TLCA § 1.01 (a Change of Control "shall occur under and as defined in any Senior Notes Indenture," which includes any applicable indenture "as thereafter amended").

On August 7, 2025, Holdings publicly filed a Form 8-K with the Securities and Exchange Commission announcing the Sale. *See* Ex. 5, 2025 8-K. The Form 8-K notified the public that Defendants would "repay and discharge all indebtedness under its existing credit facilities and indentures at par" because the Sale "constitute[d] a change of control under the terms of . . . its existing credit facilities and certain of its existing indentures." *Id.* at 3. On September 16, 2025, Holdings publicly filed a Schedule 14A Proxy Statement with the Securities and Exchange Commission again discussing the Sale. Ex. 1, Compl. ¶ 25; *see* Ex. 6, Proxy Statement. The Proxy Statement disclosed that proceeds from the Sale would be used to, among other things, repay the

2027 Notes and the Term Loan. Ex. 6, Proxy Statement at 91; Ex. 1, Compl. ¶ 26. It also incorporated the Form 8-K by reference. *See* Ex. 6, Proxy Statement at 139; *see also* Ex. 1, Compl. ¶ 25 ("[T]he Company's CEO Charles Treadway represented that '[t]he Sale may be considered to be a sale of substantially all of our assets under Delaware law . . . .'") (quoting Proxy Statement).

Following notice and an opportunity to vote, the Company's shareholders overwhelmingly voted to approve the Sale in October 2025. Ex. 1, Compl. ¶ 25. The Sale was scheduled to close in the first half of 2026. *See* Ex. 6, Proxy Statement at 51.

On January 9, 2026, the Agent issued the "Payoff Letter," which was signed by the Agent, Borrower, and Holdings. In it, the Agent acknowledged that Borrower would "prepay in full all amounts outstanding under the Credit Agreement" and thereby "terminate all Commitments under the Credit Agreement, in each case, on January 9, 2026 (the 'Payoff Date')." *See* Ex. 7, Payoff Letter ¶ 1. The Payoff Letter functioned as "notice of the [] prepayment required by the Credit Agreement," and told Borrower exactly how much it owed to the Term Loan Lenders, which the Agent defined as the "Payoff Amount." *Id.* Therein, the "Agent [] confirm[ed] that on the Payoff Date the total amount of all outstanding indebtedness (including, without limitation, principal, interest and fees) and other Obligations . . . owing as of such time under the Credit Agreement and the other Loan Documents is equal to $3,156,765,657.16 (such amount, the 'Payoff Amount')." *Id.* ¶ 1(B). Further, the schedule attached to the Payoff Letter set the "Prepayment Premium" at "$0.00." *Id.* at Schedule 1. The Payoff Letter provided that so long as "the Agent receives payment of the Payoff Amount," then the Agent "automatically and without any further action . . . releases each of the Borrower and the other Loan Parties from all liabilities, indebtedness, and other Obligations under the Credit Agreement and the other Loan Documents." *Id.* ¶ 3; *see* Ex. 3, TLCA § 9.11 (providing authority for the Agent to execute releases on behalf of the Term Loan Lenders).

The Sale closed on January 9, 2026. Ex. 1, Compl. ¶ 26. Upon closing of the Sale, Borrower voluntarily repaid the principal amount of the Term Loan, all unpaid interest, and fees in full, in the amount specified in the Payoff Letter: $3,156,765,657.16. *See id.* ¶ 14. "Immediately following the Prepayment, Apollo Administrative Agency LLC, which was the Administrative Agent under the Credit Agreement . . . confirmed that the Term Loan was 'paid in full.'" *Id.* Accordingly, on that date, "each of the Loan Documents, including the Credit Agreement, and all related instruments and agreements, [was] immediately, irrevocably and forever terminated, discharged and of no further force or effect." *See* Ex. 7, Payoff Letter ¶ 3(E). Defendants were also released from all obligations under the Credit Agreement by the Agent on behalf of the Term Loan Lenders "automatically and without any further action." *See id.* ¶ 3.

Shortly after the Sale, the unsold remainder of CommScope's business—including the two Defendant entities—rebranded under the name "Vistance Networks." *See supra* notes 2–3; Ex. 1, Compl. ¶ 26; ECF No. 1-2, Ex. A.

### E. A Single Term Loan Lender Claims Entitlement to More Money and Sues

Despite the Agent's written acknowledgements that the Term Loan was satisfied in full and ended, and that the Agent "release[d] each of the Borrower and the other Loan Parties," *see* Ex. 7, Payoff Letter ¶ 3(B), Plaintiff later sought a prepayment premium anyway.

On May 12, 2026, Plaintiff sued Defendants in New York Supreme Court, without suing or joining the Agent in the lawsuit. *See* Notice of Removal, Ex. 1, ECF No. 1-1. Instead, the Complaint alleged that the Agent is "absen[t]." Ex. 1, Compl. ¶ 14. In support of its own authority to sue, Plaintiff cites (but does not attach) a "Direction Letter effective as of May 8, 2026"—*i.e.*, four months after the Credit Agreement was terminated—from the purported "Required Lenders." *See id.* ¶¶ 14–15.

In the Complaint, Plaintiff alleges two claims: (1) Defendants breached the Credit Agreement by selling substantially all assets and thereby triggered a prepayment premium under the loan documents, *see id.* ¶ 28, and (2) Defendants breached the implied covenant of good faith and fair dealing when non-party CST "unilaterally and secretly amended" the 2027 Notes Indenture with the Trustee in the Seventh Supplemental Indenture, *id.* ¶ 35.

On June 11, 2026, Defendants removed this case to federal court. Notice of Removal, ECF No. 1. Defendants now move to dismiss the Complaint in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## LEGAL STANDARD

A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To present a plausible claim, the "pleading must contain something more . . . than . . . a statement of facts that merely creates the suspicion [of] a legally cognizable right of action." *Id.* at 555. Rather, it must allege "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When evaluating a motion to dismiss, courts "must accept as true all of the allegations contained in a complaint," but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Campbell v. Whole Foods Mkt. Grp., Inc.*, 516 F. Supp. 3d 370, 380 (S.D.N.Y. 2021).

When considering a motion to dismiss, courts may take judicial notice of publicly available information, such as information contained in documents filed with the Securities and Exchange Commission. *See Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 380 (S.D.N.Y. 2016) ("The Court may take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings

contained certain information . . . ."). Courts may also consider sources incorporated by reference in the complaint or integral to the claims therein. *Tellabs, Inc. v. Makor Issues & Rts. Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference."). "Issues of contract interpretation are generally matters of law and therefore suitable for disposition on a motion to dismiss." *Thayer v. Dial Indus. Sales, Inc.*, 85 F. Supp. 2d 263, 269 (S.D.N.Y. 2000).

The Complaint clearly identifies, discusses, quotes from, and is based upon the Credit Agreement and the 2027 Notes Indenture. *See generally* Ex. 1, Compl. Further relevant here, the Credit Agreement incorporates definitions and provisions from the 2027 Notes Indenture, as amended and supplemented. *See* Ex. 3, TLCA §§ 1.01, 6.02, 7.09(d)(2). Plaintiff's two claims are premised on alleged violations of those documents—Count I (breach of the Credit Agreement) and Count II (breach of implied covenant due to the Seventh Supplemental Indenture amending the 2027 Notes Indenture). The Complaint asserts these claims, despite admitting that the Agent agreed via the Payoff Letter that the Term Loan was "paid in full." Ex. 1, Compl. ¶ 14.

As discussed, these full sets of documents—including the Credit Agreement, the 2027 Notes Indenture, and all documents executed thereunder (including the Seventh Supplemental Indenture and the Payoff Letter)—are appropriately considered on a motion to dismiss. *See Frascatore v. Blake*, 344 F. Supp. 3d 481, 489 (S.D.N.Y. 2018) ("[T]he Court may consider documents that are either incorporated by reference in the complaint or integral to the claims asserted therein."); *see also Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court

may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment."); *AT&T Corp. v. Atos IT Sols. & Servs., Inc.,* 708 F. Supp. 3d 385, 398 (S.D.N.Y. 2023) (considering the entirety of five documents, including pricing schedules and a settlement agreement, that plaintiff did not attach to the complaint); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 234 (2d Cir. 2016) (holding the district court properly considered the "Conditions of Use" as part of the contract at issue, given that they were "integral to the complaint" and thus incorporated by reference).

## ARGUMENT

### I. PLAINTIFF DOES NOT HAVE STANDING TO SUE DEFENDANTS

Plaintiff does not have standing to bring claims against Defendants under the Credit Agreement. Plaintiff is not the proper party to bring this lawsuit, and the party who is (the Agent) did not sue. Instead, the Agent agreed that the Term Loan was repaid in full under the Credit Agreement's terms and that the loan had therefore ended. There is no Term Loan still in existence for Plaintiff to sue under, and, in any event, the Agent already released Defendants from these claims. Thus, Plaintiff lacks the authority to sue.

"Standing is a prerequisite to bringing suit in federal court." *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 541 (S.D.N.Y. 2013). To determine whether a plaintiff has standing to sue under a contract, courts look to the contract itself. *In re Enron Corp.*, 302 B.R. 463, 472 (Bankr. S.D.N.Y. 2003) ("The rights, duties and obligations of parties to a contract are dictated by the terms of their agreement."). Pursuant to those contractual terms, one party may be "given the right to sue [] on behalf of the individual members" of a larger group. *See id.* Such a design is common in the lending context. "When dealing with such lending arrangements, the purpose of contracting in advance to restrict enforcement to a single agent is to prevent the chaos that would ensue if multiple lawsuits were initiated by each lending bank with, possibly, divergent interests." *Id.* at

472–73. Therefore, where a loan agreement vests the lenders' enforcement authority in one agent, "the desire of a majority of the members of the [lender group] . . . to enforce compliance with the agreements c[an] only be implemented by [the agent]." *Id.* at 477 (holding the collateral agent, in its official capacity, must take any action under the agreements on behalf of the lender group); *see also Credit Francais Int'l S.A. v. Sociedad Financiera de Comercio, C.A.*, 490 N.Y.S.2d 670, 681–84 (N.Y. Sup. Ct. 1985) (holding plaintiff bank lacked standing to sue because "in virtually all aspects of the relationship there [was] only one institution empowered to act on behalf of all the lending banks, and that is . . . the duly designated Agent for such banks").

The Credit Agreement at issue here provides that each lender "irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement." Ex. 3, TLCA § 9.01. It further provides that "the authority to enforce rights and remedies" against the Loan Parties "shall be vested ***exclusively*** in the Administrative Agent." *Id.* § 10.03. The use of the word "exclusively" dictates that ***only*** the Agent may sue to enforce the Credit Agreement, and individual lenders cannot. *In re Application of Union Ferry Co., of Brooklyn*, 98 N.Y. 139, 151 (N.Y. 1885) ("An act does not grant an exclusive privilege or franchise unless it shuts out or excludes others from enjoying a similar privilege or franchise."); *Exclusive,* Black's Law Dictionary 459 (2d ed. 1910) ("Shutting out; debarring from interference or participation; vested in one person alone. An exclusive right is one which only the grantee thereof can exercise, and from which all others are prohibited or shut out.").

In the Credit Agreement, Plaintiff and the other Term Loan Lenders designated Apollo to act as their exclusive Agent and consented to be bound by the Agent's actions. Ex. 3, TLCA §§ 9.01, 10.03. Here, the Agent determined that the Payoff Amount owed by Borrower was $3,156,765,657.16 (and that a "Prepayment Premium" of "$0.00" was owed) and notified

Borrower of the same. Ex. 7, Payoff Letter at Schedule 1. It is undisputed that Borrower paid that amount on time, in full, as directed by the Agent, thus terminating the loan. *See* Ex. 1, Compl. ¶ 14. Accordingly, Plaintiff, as a Term Loan Lender, is bound by its designated Agent's determination of the amount owed under the Credit Agreement and Borrower's compliance therewith. To be certain, Plaintiff cites no provision in the Credit Agreement permitting it to sue simply because it disagrees with the Agent's decision of the proper Payoff Amount.

Under nearly identical circumstances, the Court in *In re Enron Corp.*, 302 B.R. 463 (Bankr. S.D.N.Y. 2003), came to the same conclusion. There, the parties' contract "irrevocably appointed Chase as Administrative Agent and Collateral Agent 'to take such action on [the lenders'] behalf and to exercise such powers as are delegated to the Administrative Agent by the terms [t]hereof, together with such actions and powers as are reasonably incidental thereto.'" *In re Enron Corp.*, 302 B.R. at 471. Pursuant to that plain language, the court determined that individual lenders, or even a group of lenders, could not maintain a proceeding under the applicable loan agreements. *Id.* at 477–78. Instead, the "Required Lenders" could make demand on the Agent to exercise certain rights or powers, and if the Agent failed to act, they could "seek to require the [Agent] to act in accordance with the demand." *Id.* at 474. The lenders did not have the independent right to sue the borrower.

So too here. The Credit Agreement vested the authority to enforce rights and remedies *exclusively* in the Agent for the Term Loan Lenders, and there is no allegation that the Agent was absent while the agreement was in effect. *See* Ex. 3, TLCA §§ 9.09, 10.03. But the Agent did not sue Defendants. Indeed, the Agent never declared any defaults, asserted entitlement by the Term Loan Lenders to a "prepayment premium," or otherwise exercised its exclusive authority to bring a claim on behalf of the Lenders against Defendants. And Plaintiff never took any action during

the pendency of the Credit Agreement to force the Agent to take action against Defendants, nor did Plaintiff challenge the Agent's authority in any way under the loan documents.

As the Complaint concedes, on January 9, 2026, the Agent acknowledged that the Prepayment Premium was $0.00 and specified the "Payoff Amount" due from Defendants later that day. *See* Ex. 1, Compl. ¶ 14. The Agent confirmed on behalf of the Term Loan Lenders that upon receipt of the Payoff Amount, there would be no further loan left to administer, and therefore, the parties confirmed in writing that they did "terminate[] (i) all Commitments under the Credit Agreement . . . and (ii) each of the Loan Documents, including the Credit Agreement . . . which shall be, and hereby are, immediately, irrevocably, and forever terminated, discharged, and of no further force and effect . . . ." Ex. 7, Payoff Letter ¶ 3(E). It is thus indisputable that the Credit Agreement was "irrevocably, and forever terminated" and is "of no further force and effect." Ex. 7, Payoff Letter ¶ 3(E). Accordingly, Plaintiff cannot sue under it. *See Sec. Alarm Fin. Enters., L.P. v. Citizens Bank, N.A.*, 2020 WL 408351, at *3–4 (S.D.N.Y. Jan. 24, 2020) (holding lender defendants could not demand money under a terminated credit agreement where defendants had already accepted amount in payoff letter and extinguished loan).

In correspondence prior to the filing of this motion to dismiss, Plaintiff's counsel argued that the Agent was required under Section 10.01 of the Credit Agreement to obtain a "waiver" from the Required Lenders before "waiving" Defendants' alleged violations in the Payoff Letter. That is incorrect. Far from the Agent waiving any violation of the Credit Agreement by Defendants, the Payoff Letter actually certifies that no prepayment premium was owed and the Term Loan was repaid in full under its express terms and therefore was extinguished. *See* Ex. 7, Payoff Letter ¶¶1–3. In no way was the Agent's determination that the prepayment premium was $0.00 an "amendment" or "waiver" of the Credit Agreement. *See* Ex. 3, TLCA § 10.01 ("[N]o

amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders . . . .").

Further, in that same Payoff Letter, the Agent "release[d] each of the Borrower and the other Loan Parties from all liabilities, indebtedness and other Obligations under the Credit Agreement and the other Loan Documents." Ex. 7, Payoff Letter ¶ 3(B). "Under New York law, a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 362 (S.D.N.Y. 2022). "If the language of a release is clear and unambiguous, the signing of a release is a jural act binding on the parties." *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (N.Y. 2011). Therefore, when "large corporations engage[] in complex transactions in which they were advised by counsel," they "cannot now invalidate" a written release. *Id.* at 278 (holding "sophisticated entities" were bound by an "extraordinarily broad release"). Accordingly, Plaintiff cannot belatedly litigate a breach claim where it already delegated such authority to its Agent, who agreed in a signed contract that the Credit Agreement no longer exists, and any claims against Defendants by the Term Loan Lenders thereunder were already released. *See Barshay v. Naithani,* 2023 WL 8708424, at *2–3 (2d Cir. Dec. 18, 2023) (affirming dismissal of lender's breach of contract claim where lender released borrower from all liabilities in a signed writing); *In re Young Broad., Inc.*, No. 09-10645, 2009 WL 8189478, at *5 (Bankr. S.D.N.Y. 2009) (holding that a credit bid made by an agent was "binding upon all Prepetition Secured Lenders" where it "was authorized under the Credit Document and this Court's Bidding Procedures Order").

Plaintiff incorrectly attempts to plead around these glaring defects by arguing that after receipt of the Payoff Amount and the Agent's confirmation on behalf of the Term Loan Lenders

"that the Term Loan was 'paid in full,'" Apollo "ceased functioning" as the Agent. *See* Ex. 1, Compl. ¶ 14. Plaintiff contends this sequence of events somehow transferred the authority to sue to the Lenders. That is wrong.

The Credit Agreement provides: "[I]f at any time there is no Person acting as Administrative Agent hereunder . . . any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders." Ex. 3, TLCA § 10.03. Section 10.03's reference to "no Person acting as the Administrative Agent" does not apply where, as here, the loan was repaid in full and therefore ceased to exist. *See id.* Art. VI (covenants exist only so long as the Loan "shall remain unpaid or unsatisfied"); § 10.13 (representations and warranties exist so long as Loan "shall remain unpaid or unsatisfied"); *see Gulley v. United States*, 150 Fed. Cl. 405, 414 (2020) ("[O]nce a loan has been discharged, the lender can no longer assert rights to the previously due funds."). Further, upon full repayment, there are no "Required Lenders" from whom Plaintiff may take direction, given that the definition necessitates the existence of lenders with a majority "of the sum of the Total Outstandings." Ex. 3, TLCA § 1.01 (defining "Required Lenders"). Following Borrower's repayment in full on January 9, 2026, there were no outstanding amounts, which the Agent admitted in a signed letter. *See* Ex. 7, Payoff Letter ¶ 3(E) (receipt of the Payoff Amount "terminates . . . each of the Loan Documents, including the Credit Agreement"). Thus, it is no surprise that the Agent has been "absent" (according to Plaintiff) following complete repayment of the loan. After January 9, 2026, there was no loan or Credit Agreement for Plaintiff, the Agent, or anyone else to enforce—and there could be no "Required Lenders" under the Credit Agreement to direct the Agent (or anyone else) to act.

Notably, Plaintiff does not claim that the Agent lacked notice of the Sale or an opportunity to consider its import before setting the Payoff Amount, finding the Credit Agreement satisfied and terminated, and releasing Defendants. In an August 7, 2025 filing with the Securities and Exchange Commission—five months before closing—Borrower provided public notice that it would sell CST and repay the Term Loan at par (without a prepayment premium) because the Sale constituted a "Change of Control." Ex. 5, 2025 8-K at 3. Following this announcement, the Agent considered the contracts and Sale structure, affirmatively concluded no prepayment premium was owed to the Term Loan Lenders, and set the Payoff Amount. Ex. 7, Payoff Letter at Schedule 1. Borrower repaid such amount, and the parties acknowledged in writing satisfaction in full of the obligations in the Credit Agreement, termination and discharge thereunder, and release of Defendants from all loan obligations. *Id.* ¶ 3(B), (E). Plaintiff's disagreement does not give it the authority to belatedly bring a claim under the already-terminated Credit Agreement.

## II. PLAINTIFF'S BREACH OF CONTRACT CLAIM IS INACTIONABLE

There is good reason that the Agent did not demand a prepayment premium or sue, and instead accepted the Payoff Amount, found the Credit Agreement satisfied and concluded, and released Defendants: the prepayment premium was not owed under the plain language of the Credit Agreement.

"Under New York law, a breach of contract claim requires (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 750 (S.D.N.Y. 2017). "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Recs., Inc.*,780 N.E.2d 166, 170 (N.Y. 2002). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* Indeed, "[a] written agreement that is complete, clear and unambiguous

on its face must be enforced according to the plain meaning of its terms." *Id.*; *see Cordero v. Transamerica Annuity Serv. Corp.*, 39 N.Y.3d 399, 410 (N.Y. 2023) ("[I]t is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists.").

The Credit Agreement exempts Defendants from paying the premium because the Term Loan was repaid in connection with a Change of Control. *See* Ex. 3, TLCA § 2.05(a)(iv). As discussed above, the definition of "Change of Control" in the Credit Agreement incorporates the definition in the 2027 Notes Indenture by cross-reference. *See id.* § 1.01.

"Under New York law, it is well established that contract terms and other agreements may be incorporated by cross-reference." *Silver v. Nissan-Infiniti LT, LLC*, 724 F. Supp. 3d 217, 223 (S.D.N.Y. 2024). For a cross-reference to have effect, the contract must expressly define the cross-referenced agreement and communicate a clear intent to incorporate it. *See id.* (granting motion to compel arbitration where the arbitration clause was contained in a cross-referenced agreement); *see also Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 13–14 (2d Cir. 2019) (affirming dismissal of breach of contract claim where contract incorporated by reference definitions from separate statute, and attendant regulations and guidance, which defeated the claim).

Here, the Credit Agreement satisfies both requirements. "Change of Control" is defined in the Credit Agreement to include "any change in control (or similar event, however denominated) with respect to Holdings or the Borrower shall occur under and as defined in any Senior Notes Indenture." Ex. 3, TLCA § 1.01. A "Senior Notes Indenture" is defined to include the 2027 Notes Indenture and subsequent amendments thereto, including the Seventh Supplemental Indenture, which provides the now-operative definition of "Change of Control." *Id.* (defining "Senior Notes Indenture" to include the 2027 Notes Indenture "as thereafter amended . . . [and] supplemented"). If Plaintiff, the Agent, or any other Lenders had an issue with these heavily negotiated terms, the

time to raise that was at the bargaining table. Instead, they chose to incorporate into their lending agreement the "Change of Control" definition from the 2027 Notes Indenture, including any subsequent amendments thereto.

Under the definition that was operative at the time of the Sale, the CCS sale qualified as a "Change of Control" for two independent reasons: (1) it is a "sale, lease or transfer . . . of all or substantially all of the assets of CommScope [Borrower] and its Subsidiaries, taken as a whole, to any Person"; and (2) "CommScope [Borrower] ceases to own, directly or indirectly, 100.0% of the outstanding Capital Stock of the Issuer [CST]." Ex. 4, Seventh Supp. Indenture § 2. The Complaint concedes that the Sale satisfied both of these subsections. Ex. 1, Compl. ¶¶ 24 ("[F]ollowing the closing [of the Sale], Amphenol owned directly and indirectly, CST and its direct and indirect subsidiaries."), 28 ("[T]he sale was of substantially all assets.").[7]

Plaintiff also argues that Borrower breached Section 7.04 of the Credit Agreement by selling all or substantially all of its assets. *See* Ex. 3, TLCA § 7.04 ("The Borrower may not, and will not permit any of its Subsidiaries to, merge, dissolve, liquidate, amalgamate . . . or dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets . . . to or in favor of any Person."). But Plaintiff ignores that the remedy for such a breach would be "acceleration of Loans following an Event of Default" under Section 8.02, which also exempts

---

[7] Plaintiff contends the definition of "Change of Control" does not apply here because "there was no change of ownership or control rights of the Borrower or Holdings." *See* Ex. 1, Compl. ¶¶ 29–30. Nothing in the operative definition requires that. *See* Ex. 4, Seventh Supp. Indenture § 2. The Sale qualifies as a "Change of Control" with respect to both Defendants because the CCS segment comprised substantially all of Defendants' assets (prong ii) and Defendants ceased to own 100.0% of the outstanding Capital Stock of CST (prong iii). *See id.*

Defendants from the prepayment premium upon repayment in connection with a "Change of Control." Ex. 3, TLCA § 8.02.[8]

Accordingly, the plain, unambiguous language of the Credit Agreement demonstrates that Defendants did not owe the prepayment premium because they repaid the Term Loan in connection with the Sale, which was a Change of Control. Thus, Plaintiff's breach of contract claim is inactionable. *See In re Lehman Bros. Holdings, Inc.*, 541 B.R. 551, 570 (Bankr. S.D.N.Y. 2015) ("[A] party does not breach an agreement by behaving as the instrument permitted.").

## III. PLAINTIFF'S BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM IS INACTIONABLE

Finally, the Complaint fails to allege that Defendants breached the implied covenant of good faith and fair dealing due to CST's amendment to the 2027 Notes Indenture. Far from undermining the contract, this amendment was entirely authorized by the Credit Agreement and cannot form the basis for an implied covenant claim.

"Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 504 (S.D.N.Y. 2021). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* However, "the implied obligation is in aid and furtherance of other terms of the agreement," and

---

[8] The Complaint alleges that "because the Sale was not 'permitted under the Loan Documents,' Section 2.05(a)(iv) of the Credit Agreement required CommScope to pay the Applicable Premium." Ex. 1, Compl. ¶ 28. But the Complaint ignores that Defendants did not owe the premium if prepayment was made "in connection with a Change of Control ***or*** with the proceeds from a disposition permitted under the Loan Documents." Ex. 3, TLCA § 2.05(a)(iv). Section 2.05(a)(iv) is a disjunctive; thus, even if a "disposition" is not "permitted under the Loan Documents," a prepayment premium still is not owed if the prepayment was "in connection with a Change of Control," which it was here.

"no obligation can be implied . . . which would be inconsistent with other [contract] terms." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (N.Y. 1983). Furthermore, when sophisticated parties negotiate a contract, they are held to their words as written. *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 437 (N.Y. 2013) ("[H]ad these sophisticated business entities, represented by counsel, intended to make [payment of a $100 million loan] a condition to the enforceability of the option, they easily could have included a provision to that effect."); *see also Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding LLC*, 20 N.Y.3d 438, 445 (N.Y. 2013) (holding that sophisticated, counseled entities are bound by the clear written words in their complex financial agreements).

Therefore, courts "should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include," a rule applied "with even greater force in commercial contracts negotiated [] by sophisticated, counseled businesspeople." *2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 210 (S.D.N.Y. 2015). In accordance with those principles, courts find actionable breaches of the implied covenant only "where an implied promise is so interwoven into the contract 'as to be necessary for effectuation of the purposes of the contract.'" *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006). When evaluating claims premised on the implied covenant of good faith and fair dealing, "courts have refused attempts to impose liability on a party that engaged in conduct permitted by a contract, even when such conduct is allegedly unreasonable." *Suthers v. Amgen, Inc.*, 441 F. Supp. 2d 478, 485 (S.D.N.Y. 2006) (dismissing breach of implied covenant claim based upon defendant's termination of a clinical trial pursuant to the terms of its agreement with plaintiffs).

Plaintiff asks this Court to read into the Credit Agreement an implied promise not to amend the "Change of Control" definition in the 2027 Notes Indenture. *See* Ex. 1, Compl. ¶ 45. The problem, of course, is that the contracts say no such thing, and instead expressly permit the amendment that occurred.

The Credit Agreement incorporates the "Change of Control" definition from the 2027 Notes Indenture, including "as thereafter amended . . . [and] supplemented or restated from time to time." Ex. 3, TLCA § 1.01. Thus, Plaintiff's proffered unwritten obligation ***not*** to amend the 2027 Notes Indenture is directly at odds with the clear written text of the Credit Agreement, and cannot be implied in the contract.[9] *See 511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (N.Y. 2002) (stating the implied covenant "do[es] not imply obligations inconsistent with the other terms of the contractual relationship"). And New York law is clear that the implied covenant of good faith cannot be used to restrict contractual rights that the parties have expressly negotiated. For example, in *Moran v. Erk*, the plaintiff asked the New York Court of Appeals to impose limitations on an attorney approval contingency clause that the parties negotiated. 11 N.Y.3d 452, 456–57 (N.Y. 2008). The court in *Moran* declined, holding that the implied covenant could not override the "plain language of the contract" which "makes clear that any 'fruits' of the contract were contingent on attorney approval, as any reasonable person in the [plaintiff's] position should have understood." *Id.* So too here. Defendants are not liable for enforcing the plain language negotiated in both the Credit Agreement and 2027 Notes Indenture. *See also Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (N.Y. 2007) ("A reading of the contract should not render any portion meaningless.").

---

[9] Tellingly, Plaintiff raised no challenges to CST's prior six amendments to the 2027 Notes Indenture. Plaintiff only takes issue with CST's seventh amendment because Plaintiff dislikes its collateral effects.

Plaintiff's contention that its consent was required to amend the "Change of Control" definition in the 2027 Notes Indenture is also inconsistent with the plain words of the contract. *See* Ex. 1, Compl. ¶ 35 (arguing Defendants wrongly "secretly amended" the 2027 Notes Indenture). Plaintiff does not claim to be a party to the 2027 Notes Indenture or have any rights thereunder, so it is puzzling why Plaintiff claims its consent was required to amend that document. And in the loan document that Plaintiff does claim rights under—the Credit Agreement—the Lenders did not bargain for language prohibiting (or requiring consent prior to) amendments to other contracts that could adversely affect their interests. Further, the parties to the Credit Agreement could have used a static definition for "Change of Control" or limited it to the definition that existed in the 2027 Notes Indenture at that time, but they did not. *See In Touch Concepts, Inc. v. Cello P'Ship*, 949 F. Supp. 2d 447, 471 (S.D.N.Y. 2013) ("Had Zcom wished for more restrictive grounds for termination, 'it could have bargained with [Verizon] to include specific limitations on [Verizon's] ability to' terminate."). Indeed, the parties to the Credit Agreement knew how to limit definitions to conditions that existed at the time of the loan documents, but *not* future amendments, because they did that elsewhere in the contract. *See, e.g.,* Ex. 3, TLCA § 1.01 (defining "Cash Management Bank" in part as any person that is a lender under "any Cash Management Agreement ***in effect on or prior to*** the Closing Date"). This all further demonstrates that Plaintiff has no legal basis to ask this Court to rewrite the words in its negotiated contract.

Here, the Credit Agreement incorporated any as-amended definition of "Change of Control" from the 2027 Notes Indenture, and neither the Credit Agreement nor the 2027 Notes Indenture obligated Defendants to consult with the Term Loan Lenders before amending the 2027

Notes Indenture or to seek their consent in any way.[10] If any of the Term Loan Lenders wished to negotiate different rights in their contract, the time to do that was at the negotiation table. Because such consent rights are absent from (and contrary to) all applicable agreements, the implied covenant of good faith and fair dealing cannot be used to read them in. *Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 456 (S.D.N.Y. 2021) ("Absent a connection to an express or presumed contractual right or obligation, the [implied covenant] doctrine 'does not import a generalized code of good conduct into the law of contracts.'").[11]

Furthermore, this court has recognized that sophisticated parties to a contract are "entitled to the benefit of [the] bargain" that they negotiated. *See In Touch Concepts, Inc.*, 949 F. Supp. 2d at 471. For example, *In Touch Concepts* involved a contract between Zcom and Verizon, pursuant to which Verizon could terminate the agreement "with or without cause." *Id.* at 456–57. After Verizon ended the contract in accordance with its contractual rights, Zcom sued Verizon for breach of the implied covenant of good faith and fair dealing, arguing Verizon improperly terminated the contract as punishment for Zcom's decision not to participate in one of Verizon's programs. *Id.* at 469. Applying New York law, the court dismissed Zcom's claim, holding that a "contracting

---

[10] Section 6.02 of the TLCA only obligates Defendants to deliver to the Agent "statement[s] or report[s] furnished to any holder of debt securities of any Loan Party or any of its Subsidiaries . . . pursuant to the terms of any Senior Notes Indenture." *See* Ex. 3, TLCA § 6.02(d). The Seventh Supplemental Indenture is not a "statement" or "report," and neither the Term Loan Lenders nor the Note Holders were required to receive notice or consent to such amendment. *See generally* Ex. 2, 2027 Notes Indenture.

[11] In any event, the Seventh Amendment to the 2027 Notes Indenture did not "destroy" the Credit Agreement or its value to the parties. *See S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 504 (S.D.N.Y. 2021). The implied covenant cannot be construed so broadly as to effectively "undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990). Plaintiff's mere unilateral desire for different terms than those written in the contract does not somehow create a breach of the duty of good faith and fair dealing.

party who has bargained for a [particular] provision . . . is entitled to the benefit of that bargain." *Id.* at 470–71. Here, non-party CST had every right to amend the 2027 Notes Indenture, and the Term Loan Lenders designated specific definitions from that indenture to carry through to the Credit Agreement. But like Zcom, Plaintiff asks this court to enforce non-existent provisions of a contract that the parties never agreed to, dressing it up as a purported implied covenant claim. New York law does not permit this Court to rewrite the unambiguous terms in the Credit Agreement; instead, it should enforce the contract as written and negotiated by these sophisticated, counseled parties.

The Complaint does not state a claim for breach of the implied covenant.

**CONCLUSION**

The Complaint should be dismissed with prejudice.

Dated: July 17, 2026

Respectfully submitted,

**LATHAM & WATKINS LLP**

By: */s/ Blake T. Denton*
Blake T. Denton
Blair Connelly
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: blake.denton@lw.com
blair.connelly@lw.com

*Attorneys for Defendants Vistance Networks Holdings, LLC (formerly CommScope, LLC) and Vistance Networks, Inc.*

**CERTIFICATE OF COMPLIANCE**

I, Blake T. Denton, an attorney duly admitted to practice before this Court, hereby certify that this motion complies with Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York and the Individual Rules for Judge Vernon Broderick. The foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint was prepared using Microsoft Word and contains 8,744 words. In making this calculation, I have relied on the page count of the word-processing program used to prepare the document.

Dated: July 17, 2026
New York, New York

*/s/ Blake T. Denton*
Blake T. Denton

*Attorney for Defendants Vistance Networks Holdings, LLC (formerly CommScope, LLC) and Vistance Networks, Inc.*